## Brown Hoisting & Conveying Machine Co. v. David Bennett.

1. APPELLATE COURT PRACTICE— *Duty When a Verdict is Not Supported by the Evidence.*—It is the duty of the appellate courts, under the law as it exists in this State, to consider the testimony, and if they find that the verdict and judgment are not supported by it, or are clearly against the weight of the evidence, to set aside such verdict and reverse the judgment.

**Trespass on the Case,** for personal injuries.   Appeal from the Circuit Court of Will County; the Hon. JOHN SMALL, Judge, presiding. Heard in this court at the April term, 1901.   Reversed, with a finding of facts. Opinion filed July 12, 1901.

GARNSEY & KNOX, attorneys for appellant.

CHENEY & EVANS, attorneys for appellee;  E. MEERS and JAMES S. HARLAN, of counsel.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

In 89 Ill. App. 113, we reversed a judgment for defendant in this case on the ground that there was sufficient proof introduced by plaintiff tending to show a right of action, so that the trial court should not have excluded it.   The case has been tried again, the proof upon both sides has been heard, and a verdict and a judgment given for plaintiff, from which defendant appeals.   The question now is whether, upon the present record, there is sufficient proof that defendant was negligent as charged; that such negligence caused plaintiff's injury, and that plaintiff was exercising due care for his own safety, so that the verdict for plaintiff on those issues should not be disturbed.   If the affirmative of those issues was established by a preponderance of the evidence, or if the evidence is so evenly balanced that the jury might reasonably determine those questions either way, the judgment should stand.   But, as said in C. & E. R. R. Co. v. Meech, 163 Ill. 305, " It is the duty of the appellate courts, under the law as it exists in this State, to

consider the testimony, and if they find that the verdict and judgment are not supported by it, or are clearly against the weight of the evidence, to set aside such verdict and reverse such judgment. A performance of this duty is absolutely essential for the rights of citizens and property owners in all those classes of cases where the judgments of the appellate courts are final and conclusive upon all questions of fact." So in Hawk v. C., B. & N. R. R. Co., 147 Ill. 399, it was said this was the duty of the Appellate Court, where the evidence was clearly insufficient to authorize the judgment.

While the drainage channel of the Sanitary District of Chicago was being cut through the solid rock in Will county, defendant had a sub-contract for hoisting and removing broken stone from the bottom of the excavation to the adjoining spoil bank, along several miles of the channel. To perform this service it constructed and operated eight cantilevers, each carrying a system of wire cables, by which large buckets, filled with broken stone, were taken up at the bottom and conveyed to the top of the spoil bank, emptied there, and returned to the bottom to be refilled. The cantilever, called also the bridge, stood at right angles to the channel, with its receiving end about twenty feet above the natural surface of the ground, and the end where the load was discharged about ninety-five feet above the natural surface. The cantilever was about 365 feet long, and at its center was supported by four upright pillars about thirty-five feet high. These in turn rested upon a platform. This platform was supported and conveyed by four sets of trucks of four wheels each, traveling upon four lines of rails, laid upon the bank parallel with the channel. There was one truck under each of the four corners. Each truck rested upon two rails about three feet apart, and the distance between the two sets of rails was about thirty feet. The solid rock was broken by explosives, and these seldom cut the stone in a straight line across the channel, but generally loosened it in a diagonal or irregular direction. Hence, though nine buckets were regularly

used with each cantilever, it was seldom they could all be taken up, emptied and returned while the bridge remained in one position, but the bridge had to be moved back and forth upon the rails, so as to be directly over each bucket when it was taken up. If the buckets and loose stone chanced to be in a straight line the cantilever might remain stationary on the rails half an hour; but usually this did not occur, and the machine was moved upon the rails at very short intervals—sometimes every minute; sometimes every three or five minutes. So, too, the distance it would be moved was constantly varying—from a single foot to ten or twenty feet or more—as was required to hook on to the bucket where it had been filled, and to leave it at the place where it was next to be filled. On the platform was an engine operated by steam, which performed the double duty of conveying the buckets and of moving the entire structure back and forth along the rails. An engineer or fireman was stationed at the engine; but the power was applied and the buckets and cantilever moved by an operator who was stationed fifteen feet above the engine. The escape of steam from this engine was by a pipe discharging sixty to one hundred feet in the air. The engine was supplied with water from a tank standing on the cantilever. This was filled by a steam pump kept in constant operation while work was being carried on. This pump discharged its waste steam underneath the platform, near the center of the cantilever, through a three-quarter-inch pipe, ending about three feet from the ground.

The cantilever was moved by power applied to two of the trucks by certain gear wheels. It was necessary the journals of the axles of these trucks should be kept constantly supplied with oil. If left dry five minutes while in motion they were liable to be burned or cut. The lubricant was supplied by placing oil and waste in a receptacle underneath, held in place by two bolts. When oil was needed the oiler had to put his arms through the spokes of a track wheel, and with one hand support the bottom of the box while he removed the nuts from the ends of the bolts with his other

hand. He then took out the box, supplied it with oil and waste, replaced it, and screwed on the nuts. The cantilevers were numbered one to eight, respectively, beginning at the south. On January 17, 1895, David Bennett was acting as oiler upon No. 2. As he came down from the top, where he had been oiling, he heard a noise indicating the axle on the northwest corner was dry. ·He placed his arms through the spokes of the outer wheel, removed one nut and was in the act of removing the other, one hand supporting the box and the other unscrewing the nut. At that instant, according to his testimony, a large quantity of steam was discharged in his face; he withdrew one hand and placed it over his eyes to protect them, but kept the other in position; the cantilever started, and his left arm, still in the machine, was broken at or near the elbow, and so nearly cut off that amputation was necessary. He brought this suit to recover damages for the injuries sustained.

The declaration contained four counts, two original and two additional. The first, second and fourth fully described the machine and manner of oiling it, and averred plaintiff was in the employ of defendant as an oiler of machinery under the direction of its agent, and was in the exercise of due care, and described his position in oiling it, the escape of steam into his face, and the loss of his arm. The first count charged that defendant, in violation of its duty, did not provide plaintiff with suitable appliances, and did not construct the cantilever so it was reasonably safe for the performance by plaintiff of his duties, and did not so manage the machine that it would be reasonably safe for the performance of his duties. It averred that it became necessary to place his head so near a steam vent that escaping steam would daze and blind him, and that while he was oiling said axle, steam was negligently turned on and escaped from said pipe into his face, and he was thereby blinded; that the machine was negligently started to move upon the tracks and plaintiff was prevented from seeing it start, and his arm was caught. The second charged defendant, in violation of its duty, did not instruct plaintiff

as to the danger of said machine, and the manner of operating and controlling it, and did not point out the danger of oiling it while in operation; that plaintiff had no notice or knowledge of the dangers of what he did; that as he was oiling the axle, steam was turned on and escaped from said pipe into his face, and he was dazed and blinded thereby as the machine was moved, and by reason thereof his arm was caught.

The fourth averred plaintiff was uninformed as to the manner of operating the machine, and of the dangers of attending it, and of the outlet of the steam pipe and the dangers therefrom; that defendant, disregarding its duty, did not instruct plaintiff on these subjects, and without doing so, negligently ordered plaintiff to oil said cantilever, and while he was doing so, with his head in front of and near the vent, steam was turned on without notice, and escaping from said outlet, so blinded and confused plaintiff that he was not able to see or apprehend that the cantilever had been placed in motion, by means whereof his arm was caught. The third count was general : that defendant, disregarding its duty, so negligently operated the cantilever that a part of it came down on plaintiff's arm, while he was oiling the machine under direction of defendant, and broke it.

Bennett was a sailor. Sailors were preferred for some duties about these machines because accustomed to work high above the surface. The eight cantilevers were exactly alike, so far as the parts involved in this case are concerned. Bennett worked for defendant six weeks in 1893 in putting up Nos. 1 and 2. In November, 1894, he was re-employed, and did various kinds of work, as an extra man. He worked around Nos. 3 and 4 a short time. Then he worked in the shop, helping repair buckets. About the middle of December his foreman sent him to Rosnell, an oiler, to learn how to oil the cantilevers. Rosnell went over one machine with him, and showed him each place which required oiling and how to do it. Rosnell showed him the bearing of this axle, and how to put his arms through the spokes of the track

wheel and hold the box with his left hand and take off the nuts with his right.  Plaintiff testifies Rosnell also said to him, "When you are oiling here, watch the wheel;" and "You will have to watch the wheel."  Rosnell explained to him the great weight which rested on these axles, and that the oiler must watch them and not let them get dry, as they were liable to cut down in five minutes, if dry.  Afterward plaintiff oiled No. 1 once about Christmas.  Still later plaintiff was sent to No. 8 to help take off an axle box that had been burned.  He worked at this a day, helping the operator and the fireman of that machine, and he there saw how the boxes were constructed, and had full opportunity to see all their surroundings.  The oiler of that machine was discharged for letting it burn out, and Bennett took his place and oiled that machine till the middle of the forenoon of the third day.  He testified he only oiled it on top and not at the axles below.  He then went back to the shop.  On January 16, 1895, Rosnell was hurt, and Bennett was sent to oil in his place.  He oiled Nos. 1 and 2 on top that afternoon, and the next forenoon.  As he was coming down from the top of No. 2, between ten and eleven o'clock, he heard a grating noise underneath.  He came down and looked and could see nothing.  The cantilever stopped and he walked over in the middle of the track and waited for it to move upon the track.  When it moved he located the sound in the journal of this axle.  Then he began taking off the box, and while he had both hands employed as already described, or, as he testified in another place, just as he had the nut off and was taking his right hand out, a gush of steam struck him in the face; he withdrew his right hand and placed it over his eyes to protect them; the cantilever started; he did not see the wheel move because of the steam, and did not remove his left arm, and it was crushed.

The foregoing narration is as given by plaintiff.  Defendant introduced proof of a partially different state of facts.  Rosnell testified that when he instructed plaintiff how to oil, he told plaintiff these inside gears should be oiled at noon time, when the machine was not in motion;

that the machine was liable to start almost any minute, and if the oiler's hand was through the spokes he would be liable to get it cut off; that if the axle needed oiling while the work was going on, all he had to do was to notify the operator, and the operator would stop while he was doing that work. Matthews, the general foreman, who hired Bennett both times, testified he also told plaintiff it was very dangerous oiling below; that it was best not to oil any box below while the machine was in operation; that if he found any box getting hot, to notify the operator first and then get some oil. It was a standing order that if an oiler notified an operator to stop he must do so at once. The operator of this particular cantilever had orders not only to stop at once when notified by the oiler, but also to go down and help if necessary. Matthews also testified that at a prior date he saw Bennett oiling a box when the machine was liable to start, and that he cautioned him then, and told him it was against the rules to oil those boxes while the machine was in operation, and that Bennett replied that he knew it, but he could do it and not get hurt. Matthews also testified that after the injury Bennett told him it was all his own fault, and he wished he had followed Matthews' advice a little more. There was proof by several witnesses that Bennett had done considerably more oiling than he admitted while testifying. Matthews testified that he had seen him oiling frequently. Keil, at that time fireman on No. 5, testified Bennett occasionally oiled on that machine, and not only on top but also the gearings underneath. Bennett denied receiving the instructions testified to by Rosnell and Matthews, and denied making the admission testified to by Matthews, and testified he had never oiled the box under the gearing until the time he was hurt.

Many of the operators, engineers or firemen, and oilers on the eight machines were examined, either for plaintiff or defendant, as to the proper practice when an oiler found it necessary to oil underneath while the machine was at work. According to some, it was the inflexible rule that in such case the oiler should climb the ladder to the operator's sta-

tion and notify him, and the operator at once shut down, and stayed shut down until notified by the oiler the work was done. According to others, when the operator was about to move the machine upon the tracks he pushed a lever, which produced a peculiar sound, plainly heard by the oiler at the axle; and this sound was heard a perceptible period of time before the machine began to move, and time enough for the oiler to remove his hands from the spokes after hearing the sound and before the machine moved. Others testified it was only necessary for the oiler to watch the wheel, and remove his arms the instant it began to move. The machine was so heavy it could not instantly take up much motion along the rails, and some of the oilers relied upon their sight for their protection. There was no proof there was not ample time for the oiler to remove his arms after he saw the wheel start, nor that those who relied upon that signal had ever found it insufficient. If, therefore, Rosnell only told Bennett to watch the wheel, as plaintiff testifies, this seems to have been sufficient instruction in a matter where the danger was so obvious and certain that it would seem no instruction was required. It is clear from Bennett's testimony that he understood that he was to watch the wheel in order to withdraw his arms the instant it started, and knew that if he did not do so they would be crushed. He testifies he was watching the wheel when the steam came. He knew he could not see the wheel after the steam came, and his only excuse for not instantly withdrawing his left arm from this position of known and obvious danger, after the sight of the wheel, his only protection, was withdrawn, was that the steam confused him and made him forget.

Defendant did not inform Bennett of the discharge pipe under the platform. This was not the pipe for discharging exhausted steam from the engine which operated the buckets and cantilever. That exhaust was discharged from sixty to one hundred feet above the ground. It was not true, as charged in each count of the declaration except the third, that steam was negligently " turned on " and thereby es-

caped into plaintiff's face. A three-quarter-inch pipe conveyed the exhaust from the steam pump and discharged it under the platform and about three feet above the ground, near the center of the machine. The clear preponderance of the proof is, that instead of being discharged close to the place where plaintiff's head was as he removed this box, and toward his face, it was discharged eight or ten feet from that place, and not so as to be in the face of a man at work where plaintiff was. The pump ran all day while the buckets were at work. It seldom stopped. The discharge of steam from the pump was automatic and went on just the same whether the machine was moving on the rails or not. Setting the cantilever in motion or stopping it, and moving buckets or refraining from doing so, had no connection with the operation of the steam pump, and did not affect the discharge of steam therefrom. When the machine was stopped for the noon hour, or if the machine broke down and stopped work entirely, then the pump was stopped; otherwise, it ran substantially all the time all day. The pipe in question discharged steam almost constantly—some witnesses say every three or four seconds—and the slowest discharge testified to was nine or ten times a minute, or every six seconds. Each discharge made a hissing sound which could be heard quite a distance. The steam itself, as it escaped, was plainly visible, especially in winter. Bennett had assisted six weeks in putting Nos. 1 and 2 together. He had afterward been working around these various machines two months. A month before the injury he had been taught how to oil every part, including these axles. He had oiled on different machines several times after being instructed. At the time of the injury he had been oiling Nos. 1 and 2 nearly a day. It is practically impossible he should not have been familiar with the place and manner and frequency of the discharge of steam from the pump, and of the volume of steam that escaped therefrom. A witness testified Bennett was around half the time where he could see this steam coming out. Before he began to take off this box he testified he stood fifteen min-

utes on the track in front of the machine, waiting for it to move. All this time the pump must have been working. If he did not know there was steam constantly discharging under the platform, then it was because he was inattentive to the work in which he was engaged. The quantity of steam discharged at the time plaintiff was hurt seems to be exaggerated by plaintiff and by Carter, the teamster who came at plaintiff's call for help. The great preponderance is the discharge of steam was slight all the time. But whether slight or great, it was almost continuous, and was obvious to the sight and hearing of every one working about the cantilevers. We can not believe defendant was required to instruct Bennett as to that which was patent to every one, and which had necessarily been seen and heard by him for two months before the injury.

Bennett had worked six weeks on these machines while they were being put up. He had worked about them two months in many capacities while they were in active operation. It is clear he was familiar in a general way with their construction and mode of operation and control. This machine was operated that day just as it had always been. No one directed Bennett to oil this axle at that particular time. No one knew he had gone to it, and was in the position where he was hurt. He placed himself in a position of danger out of the view of the operator and of the man at the engine, and without informing any one. He knew the machine was constantly moving back and forth upon the track. It had been in almost constant motion upon the track while he had been oiling on top the afternoon before and that forenoon. It was moving on the track when he first heard the grating noise as he was coming down from the top. It stopped before he got down. He waited for it to move again, and it did so. He knew that by stepping to the edge of the channel, a few feet away, he could see whether the buckets were in line and the machine likely to remain stationary awhile, or were out of line and the machine likely to move almost immediately. He did not take this precaution. He did not notify the operator of the

grinding sound and of the necessity to oil the axle at once. He knew he was putting himself in a perilous position, but he did not tell any one what he was going to do. It required no instruction to advise him of the perfectly obvious proposition that if the cantilever moved upon the track while his arms were extended through the spokes of the wheel he was sure to be hurt. He could not fail to know that danger. He relied upon watching the wheel, intending to withdraw his arms the instant the wheel began to move. He knew the oiler who let the box burn out on No. 8 was discharged. He was anxious to do his duty and satisfy his employer. In his haste he forgot his own danger and forgot the obvious precautions. The injury was a sad one, but even upon his own testimony, considered in connection with the facts which could not fail to be known to him, and the dangers which were obvious to every one, it is clear to us he was injured solely because he did not exercise due care for his own safety. Defendant did not negligently " turn on " steam, and did not negligently move the machine upon the track; the injury was not due to any lack of instruction by defendant or lack of knowledge by plaintiff; nor was the cantilever in any manner negligently operated. We have given careful consideration to the evidence, and are of opinion no negligence is shown except that of the plaintiff. The case has been tried three times, and we must assume all known facts appear in the present record. The judgment is therefore reversed.

**Finding of Facts** to be incorporated in the judgment :

We find from the evidence that defendant was not negligent as charged in the declaration, and that plaintiff was not exercising due care for his own safety at the time he was injured, and that the injury to plaintiff for which this suit was brought was caused by his own negligence.